UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | No. 3:05-00184 JUDGE ECHOLS |
| JASON GRANT JONES, | ) ) | |
| Defendant. | ) | |

## MEMORANDUM

Pending before the Court is Defendant Jason Grant Jones's Motion to Suppress (Docket Entry No. 26) to which the Government responded in opposition. The Court held a hearing on the Motion to Suppress on November 21, 2006. Although the Government contends the Motion is untimely filed, the Court previously granted Defendant leave to file the Motion out of time. (Docket Entry No. 38, Order at 2.)

## I. FINDINGS OF FACT

At approximately 9:55 a.m. on October 3, 2005, Defendant and his wife, Tammy Jones, were traveling westbound in a gold 1993 Lexus with Kentucky license plates near the 86 mile marker on I-24 in Rutherford County, Tennessee. Tammy Jones was driving and Defendant was a front-seat passenger. Using radar equipment, Rutherford County Sheriff's Deputy Kenneth Barrett clocked the Lexus at 77 miles per hour in a 70 mile-per-hour speed zone. He activated the blue lights on his patrol car to stop the vehicle. While following the Lexus, Deputy Barrett activated a video camera in his patrol vehicle and videotaped the stop. (Gov't Ex. 1.)

1

Deputy Barrett has worked in patrol since 1998 and has made hundreds of traffic stops. He and five other officers who work the day shift are assigned to patrol sixteen miles of the I-24 corridor looking for traffic violations and secondary crimes, including narcotics and gun offenses. Deputy Barrett calibrated his radar equipment before starting patrol that morning.

Tammy Jones stopped the Lexus on the shoulder of I-24. The car has tinted windows. As Deputy Barrett stepped out of his patrol car, he turned on a wireless microphone connected to the video recording equipment. At approximately 9:58 a.m., he approached the Lexus on the passenger side for safety reasons due to the high volume of traffic on the interstate. Deputy Barrett walked directly up to the passenger window as it lowered and placed his hands on the upper door frame, with his head nearly touching the car so that he could see down into the passenger compartment, including the back seat. Deputy Barrett stayed in this position about two minutes while he spoke to the occupants. He did not see any contraband or weapons in plain view and he did not smell any alcohol or narcotic odor.

The audio portion of the videotape is difficult to hear and the Court cannot discern all that was said during the two-minute period Deputy Barrett stood at the car window. The Court accepts Deputy Barrett's testimony as to what transpired. He told the Joneses he had clocked the car going 77 miles per hour in a 70-mile-per-hour zone, and Tammy Jones responded she was driving 73 miles per hour. Defendant stated the wheels and tires on the car

had recently been changed and this might account for any speed discrepancy. Deputy Barrett asked Tammy Jones for her driver's license, and she produced a Kentucky driver's license. (Def. Ex. 1.) Defendant could not find the vehicle registration in the glovebox and did not produce it.[1]

As Deputy Barrett attempted to speak with the driver, Tammy Jones, the Defendant repeatedly jumped in to cut his wife out of the conversation. Deputy Barrett did not recall all that Defendant said, but Defendant was talkative. The Court credits Deputy Barrett's testimony that he thought this was unusual because, in his experience, passengers at traffic stops tend to remain quiet while the officer speaks to the driver. According to Deputy Barrett, Defendant appeared to be nervous, although Deputy Barrett admitted on cross-examination that most people are nervous during a traffic stop. Deputy Barrett told Tammy Jones that he would check to see if she had any outstanding warrants and if his inquiry came back negative, he would write her a warning ticket.[2] At

---

[1] The Kentucky registration and Certificate of Title were later found in the glovebox during an inventory search. The title shows Defendant is the owner of the car (Def. Ex. 3), but Deputy Barrett did not see this document at the time of the stop. The Court credits Deputy Barrett's testimony that he did not recall if he asked who owned the car. Due to the poor audio on the videotape, the Court cannot tell whether Deputy Barrett asked the occupants who owned the car.

[2] The Court credits Deputy Barrett's testimony on cross-examination that the Rutherford County Sheriff instructs his deputies to watch for traffic violations, but to refrain from writing tickets, and that a high number of traffic stops involve vehicles bearing out-of-state license plates. According to Deputy Barrett, warning tickets are given to drivers to encourage them to slow down and travel safely.

3

approximately 10:00 a.m., he asked her to step out of the Lexus and walk to the back of the car with him.

Deputy Barrett asked where they had been, and she responded, "Florida." When asked where in Florida, she said "Daytona" and "Panama City," and stated they had been there two or three days. The Court credits Deputy Barrett's testimony that he thought this seemed like a lot of travel in a short period for Kentucky residents. Deputy Barrett testified that, when asked if they were in Florida on vacation or for work, Tammy Jones answered yes to both questions and seemed to agree with whatever he said. He thought her response was odd, since usually a person would say one or the other. The Court credits Deputy Barrett's testimony that these responses by Tammy Jones raised his suspicion.

Deputy Barrett returned to his patrol car, contacted the dispatcher, and asked for a records check on Tammy Jones. During this period, Tammy Jones waited calmly in front of the patrol car. She did not appear to be nervous, and in fact she yawned once. The dispatcher did not contact Deputy Barrett with the results of the records check at any time during the traffic stop.

At approximately 10:02 a.m., Deputy Barrett returned to the front of his patrol car where Tammy Jones was standing and began writing out a warning ticket for speeding. (Def. Ex. 2, Complaint-Affidavit.) The two engaged in conversation for the next two minutes while Deputy Barrett wrote the warning ticket, but the audio portion of the tape is difficult to hear. The Court accepts Deputy Barrett's testimony that he asked Tammy Jones what her

4

husband did for a living and she had to think about her response. She responded that he worked in construction, framing and roofing houses. The Court finds that this latter comment was not an unusual response, although Deputy Barrett seemed to think it was.

The videotape reflects that, at about 10:04 a.m., Deputy Barrett asked Tammy Jones if he could search the vehicle. She responded that he could look inside the vehicle, but he could not search it. This response caught Deputy Barrett off guard. To clarify, Deputy Barrett asked, "So you don't want me to search it?" Tammy Jones shook her head, "no." Deputy Barrett understood that Tammy Jones refused consent to search the vehicle. Deputy Barrett did not ask Defendant for consent to search the car.

Deputy Barrett immediately turned around to face his patrol vehicle, set the warning ticket[3] down on the hood of the patrol car, and motioned to someone at the right of his patrol car. At some unknown point during the traffic stop, Deputy Sheriff Lee Young had arrived in his patrol car with his canine, Arak. Deputy Young testified that he happened upon Deputy Barrett by coincidence while patrolling I-24, and he stopped to see if Deputy Barrett needed any assistance. He stated the deputies routinely stopped to check on one another for safety reasons, and he admitted that the deputies' primary job on the interstate is to identify and suppress secondary crimes. Deputy Young denied that Deputy Barrett, the dispatcher, or anyone else contacted him and asked for his presence

---

[3]Deputy Barrett did not sign this warning ticket (Def. Ex. 2) and apparently never issued it to Tammy Jones.

5

at the scene. Because Deputy Young testified that deputies have access to cell phones and two-way radios that are not logged by dispatch, the Court finds it difficult to believe that there was not some communication directing or summoning Deputy Young to the scene. Deputy Barrett's videotaped motion to the right of his patrol car immediately after Tammy Jones refused consent to search indicates to the Court that Officer Young and Arak were already out of their patrol car and standing at the ready to assist Deputy Barrett within seven minutes after the initial vehicle stop.

At 10:05 a.m., Deputy Barrett returned to the passenger side of the Lexus, opened the door, and asked Defendant to step out. Defendant complied and faced Deputy Barrett's patrol car with his arms in the air. Deputy Barrett patted down Defendant's pockets and asked him if he had any weapons. No weapons were found and nothing was taken from Defendant's pockets. Deputy Barrett asked Defendant where they had been and Defendant told him "Georgia." The Court credits Deputy Barrett's testimony that Defendant's response conflicted with Tammy Jones' statement that they had been in Florida.

After removing Defendant from the Lexus, Deputy Barrett motioned again for Deputy Young and Arak. At 10:06 a.m., Deputy Young ran Arak around the vehicle starting at the right rear quarter panel and going along the right side and across the front of the vehicle. The view of the dog sniff at the front and left side of the vehicle is obstructed on the videotape because the Joneses were standing between the video camera in the patrol car

6

and their vehicle. The Court credits Deputy Young's testimony that Arak passively alerted to the odor of a narcotic at the driver's door of the vehicle.[4] Deputy Young signaled to Deputy Barrett by a head nod that the dog had given a positive alert. The entire dog sniff lasted approximately 45 seconds. At 10:07 a.m., Deputy Barrett informed the Joneses that Arak had alerted to the odor of a narcotic and that the Lexus would be searched.

Based on Deputy Young's testimony, the Court finds that Arak has been properly trained and is nationally certified to alert to the odor of methamphetamine, marijuana, cocaine and crack cocaine. Arak has a one hundred percent (100%) accuracy rate in training, but Deputy Young could not provide an accuracy rate for Arak working in the field. The Court finds on the evidence presented that Arak's passive alert to the odor of a narcotic at the driver's door of the Lexus was sufficiently reliable to establish probable cause to conduct a full-blown search of the passenger compartment of the vehicle.

Deputy Young directed Tammy Jones to move to the right front of the Lexus and wait there during the search, which she did. Defendant remained standing in front of Deputy Barrett's patrol car. The deputies then began searching the passenger compartment of the vehicle.

---

[4]Deputy Young explained that when Arak "gets into odor" he gets as close as he can to the odor and then becomes stationary, which is a passive alert. Some canines alert aggressively to narcotics odor by scratching, pawing or barking at the place where odor is detected.

7

At approximately 10:11 a.m., Deputy Young located in Tammy Jones's purse a small quantity of what appeared to be, in Deputy Young's training and experience, crystal methamphetamine. The substance was not field-tested. The Court credits Deputy Barrett's testimony that Defendant then stated whatever was found in the car was his. At that point, the deputies placed Defendant and Tammy Jones under arrest and handcuffed them. Deputy Barrett read them the <u>Miranda</u> rights and they stated they understood their rights. While being searched incident to arrest, Defendant turned over a methamphetamine pipe hidden in his shorts. Defendant and Tammy Jones were then removed from the front of the patrol car to a point behind the video camera where they could no longer be seen.

The deputies searched at least two black duffel bags and other luggage that had been sitting on the back passenger seat of the Lexus. They found approximately six ounces of crystal methamphetamine, digital scales, a large number of small plastic baggies, cash, and a water bottle and Pepsi can with false compartments used to hide contraband. During a later inventory search of the vehicle at the Sheriff's Department, a hideaway key box containing approximately five grams of crystal methamphetamine was found.

## II. <u>CONCLUSIONS OF LAW</u>

Because the seizure of illegal narcotics and drug paraphernalia from the Lexus affects the Fourth Amendment interests of both occupants, Defendant, as the passenger, may challenge his

8

detention during the stop of the Lexus. See United States v. Perez, 440 F.3d 363, 369 (6th Cir. 2006).

**A. Probable cause for the traffic stop**

A temporary detention of individuals by police during a traffic stop, even if only for a brief period and for a limited purpose, constitutes a "seizure" of "persons" within the meaning of the Fourth Amendment. Whren v. United States, 517 U.S. 806, 810 (1996). An officer may stop a vehicle so long as he has probable cause to believe that a traffic violation has occurred, even if his true reason for the stop is motivated by something other than the traffic offense itself, such as drug interdiction. Id.; United States v. Hill, 195 F.3d 258, 264 (6th Cir. 1999).

The Court concludes that Deputy Barrett had probable cause for the traffic stop, even if his subjective intent in stopping the Lexus was to investigate a potential drug crime. See United States v. Garrido-Santana, 360 F.3d 565, 571 (6th Cir. 2004). Deputy Barrett used calibrated radar equipment to clock the Lexus traveling at 77 miles per hour in a 70-mile-per-hour speed zone. Tammy Jones, the driver, admitted to Deputy Barrett that she was traveling at least 73 miles per hour. Driving at a speed higher than 70 miles per hour on an interstate highway violates Tennessee law. Tenn. Code Ann. § 55-8-152(c). Therefore, Deputy Barrett had probable cause to support the traffic stop, and suppression is not warranted on this basis. See Whren, 517 U.S. at 810; Hill, 195 F.3d at 264.

**B. Length of the detention**

"A seizure that is justified solely by the interest in issuing a warning ticket to the driver can become unlawful if it is prolonged beyond the time reasonably required to complete that mission." Illinois v. Caballes, 543 U.S. 405, 407 (2005). The Supreme Court has recently reiterated, however, that "[o]fficial conduct that does not 'compromise any legitimate interest in privacy' is not a search subject to the Fourth Amendment." Id. (quoting United States v. Jacobsen, 466 U.S. 109, 124 (1984)). Any interest in possessing contraband cannot be deemed "legitimate," and consequently, "the use of a well-trained narcotics-detection dog – one that 'does not expose noncontraband items that otherwise would remain hidden from public view,' Place, 462 U.S., at 707, 103 S.Ct. 2637 – during a lawful traffic stop, generally does not implicate legitimate privacy interests." Id.

As in Caballes, "the dog sniff was performed on the exterior of [the Joneses'] car while [they] were lawfully seized for a traffic violation. Any intrusion on [the Joneses'] privacy expectations does not rise to the level of a constitutionally cognizable infringement." Caballes, 543 U.S. at 409. See also Perez, 440 F.3d at 375 ("In rejecting the proposition that reasonable suspicion is required to justify using a drug dog during a legitimate traffic stop, the Supreme Court made clear that use of a well-trained drug dog does not in itself implicate any legitimate privacy interests.")

10

In any event, the Court finds, under the totality of the circumstances, that Deputy Barrett had reasonable suspicion to investigate further whether narcotics might be located within the vehicle. To detain a motorist any longer than is reasonably necessary to issue a traffic citation, an officer must have reasonable suspicion that the individual has engaged in more extensive criminal conduct. United States v. Townsend, 305 F.3d 537, 541 (6th Cir. 2002). "The reasonable suspicion required for continued investigatory detention is not as demanding a standard, however, as the probable cause required for the ultimate search." Id. The Court must look at the totality of circumstances considered by the deputy to determine if there was sufficient reasonable suspicion to detain the Defendant a longer period of time. Id. at 542; United States v. Arvizu, 534 U.S. 266, 273 (2002). Officers are permitted "to draw on their own experiences and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.'" Arvizu, 534 U.S. at 273. The investigative means used should be the least intrusive means reasonably available to verify or dispel the officer's suspicions in a short period of time. Perez, 440 F.3d at 372.

Here, Deputy Barrett's suspicion was aroused as soon as he reached the passenger car window and addressed its occupants. Defendant's nervousness in the context of a traffic stop is an unreliable indicator of other criminal activity, see United States v. Richardson, 385 F.3d 625, 630-631 (6th Cir. 2004), but

11

Defendant's conduct went beyond nervousness. He attempted to control the conversation with Deputy Barrett by giving an explanation for the car's speed and by attempting to exclude his wife from participating in the conversation with Deputy Barrett, even though she was the driver of the vehicle to whom Deputy Barrett addressed his remarks. Thus, Deputy Barrett asked Tammy Jones to step out of the Lexus so he could speak with her privately. He knew from her driver's license and her vehicle license plates that she was from Kentucky. Her disclosure that they had been to Daytona and Panama City, Florida, but only for two or three days, raised further suspicion. She hesitated when asked what her husband did for a living and had to think about the question. She seemed to try to agree with whatever Deputy Barrett said to her.

Reasonable suspicion can be based on a totality of the circumstances, no one of which standing alone would create reasonable suspicion. Richardson, 385 F.3d at 631; United States v. Orsolini, 300 F.3d 724, 728 (6th Cir. 2002). The Court concludes that the string of unusual occurrences just identified, taken as a whole, aroused Deputy Barrett's reasonable suspicion that criminal activity might be afoot.

While writing the warning ticket, Deputy Barrett asked for permission to search the car and Tammy Jones refused. The refusal of a driver to give consent for the search of a vehicle is not an appropriate basis for reasonable suspicion. United States v. Smith, 263 F.3d 571, 594 (6th Cir. 2001). Watching the videotape,

12

it might appear from Deputy Barrett's body language upon hearing her refusal and his immediate motion to Deputy Young and Arak that the refusal to allow a search is what prompted him to use the narcotics dog.  See id.  However, Deputy Barrett did not immediately proceed with a dog sniff.  Rather, he went to the passenger side of the car and asked Defendant to get out of the vehicle.  When asked where they had been, Defendant responded, "Georgia."  This response conflicted with Tammy Jones's statement that they had been in Florida, and it added additional doubt about the veracity of the Joneses' comments.  Lying about travel plans can form the basis for reasonable suspicion.  Hill, 195 F.3d at 272.

The Court concludes that Deputy Barrett had sufficiently reasonable suspicion that illegal narcotics might be in the car to use the dog sniff to quickly dispel or confirm his concern.  Use of the dog sniff was reasonably related in scope to the circumstances which justified the interference.  See Ohio v. Robinette, 519 U.S. 33, 39 (1996); Orsolini, 300 F.3d at 728; Hill, 195 F.3d at 269.  Deputy Young and Arak were already on the scene, and the Defendant was not required to wait for them to arrive.  See United States v. Carpenter, 406 F.3d 915, 916 (7th Cir. 2005) ("given Caballes the only step that could be attacked as 'unreasonable' is delay until the dog arrived, and that delay was short").

The dog sniff began at 10:06 a.m., just eight minutes after Deputy Barrett stopped the Lexus.  After the dog alerted, the deputies had probable cause to search the vehicle.  See Caballes,

13

125 S.Ct. at 837; United States v. Diaz, 25 F.3d 392, 393-394 (6th Cir. 1994). The deputies immediately searched the passenger compartment and found a small quantity of crystal methamphetamine in Tammy Jones's purse. She and the Defendant were placed under arrest and read their Miranda rights, all within fifteen minutes of the initial traffic stop. This short lapse of time from the beginning of the traffic stop to its culmination in the arrest of the Joneses does not constitute a prolonged and unconstitutional detention under the totality of the circumstances. See United States v. Garrido, — F.3d —, 2006 WL 3230165 (6th Cir. Nov. 9, 2006); Orsolini, 300 F.3d at 730. Cf. United States v. Davis, 430 F.3d 345, (6th Cir. 2005).

### III. CONCLUSION

For all of the reasons stated, Defendant's Motion to Suppress (Docket Entry No. 26), will be denied.

An appropriate Order will be entered.

_____
ROBERT L. ECHOLS
UNITED STATES DISTRICT JUDGE